UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SARAH M., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration, <br><br> Defendant. | No. 21 CV 2454 <br><br> Judge Manish S. Shah |

MEMORANDUM OPINION AND ORDER

Plaintiff Sarah M.[1] appeals the Social Security Commissioner's denial of her application for disability insurance benefits. Plaintiff has a diagnosis of a severe, progressive neurological disorder, but substantial evidence nevertheless supported the decision that plaintiff's limitations did not yet reach the level of disability required for benefits. The agency decision is affirmed.

I.  **Legal Standards**

District courts reviewing social security decisions have a limited role to play, and must affirm if the ALJ applied the law correctly and supported his decision with substantial evidence. *Mandrell v. Kijakazi*, 25 F.4th 514, 515 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).[2] Substantial evidence isn't a high bar, *Karr*

---

[1] I refer to plaintiff by her first name and the first initial of her last name to comply with Internal Operating Procedure 22.

[2] The ALJ's decision became final under the Social Security Act when the Appeals Council declined review. *See* 42 U.S.C. § 405(g); *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021) (citations omitted).

*v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill,* 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 206 (1938)).

## II.     Background

Sarah M. was diagnosed with Huntington's disease, and also suffered from insomnia, chronic fatigue, and anxiety. R. 17–18, 456, 472, 504, 730.[3] Medical records showed that she had an episode of Bell's palsy. R. 18, 702–08. As a result of her conditions, Sarah M. said that she spent most of her days on the couch, had trouble moving, experienced weakness and sometimes fell, had difficulty with short-term memory, and experienced symptoms of depression and anxiety. R. 21, 51–56.

She filed an application for disability insurance benefits. R. 264–70. The Social Security Administration denied the application initially and on reconsideration. R. 90, 103. Sarah M. appealed her case to an ALJ. R. 121–26. Two weeks after a hearing, the ALJ denied the claim, concluding that Sarah M. wasn't disabled during the period in question. R. 15–26.

The ALJ used the familiar five-step process to decide the disability question. R. 15–26. The five steps ask: 1) whether the claimant is currently employed; 2) whether the claimant has a severe impairment; 3) whether the claimant's

---

[3] The administrative record, cited as R., can be found at [9-1] and [9-2]. Bracketed numbers refer to entries on the district court docket. Other than in citations to the administrative record (which use page numbers from the bottom of the record), referenced page numbers are taken from the CM/ECF header placed at the top of filings.

impairment is one that the Commissioner considers conclusively disabling; 4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work; and 5) whether the claimant is capable of performing any work in the national economy. 20 C.F.R. § 404.1520. If the agency cannot determine disability at a step, it goes on to the next step. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of proving disability at steps one through four; the burden of proof shifts to the Commissioner at step five. *See Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (citation omitted).

At step one, the ALJ found that Sarah M. hadn't been gainfully employed since her alleged onset date. R. 17. At step two, the ALJ found that plaintiff had four severe impairments: Huntington's disease, insomnia, fatigue, and anxiety. R. 17–18. The ALJ found that Sarah M.'s Bell's palsy wasn't severe because while it was intense for a time, the condition was temporary. R. 18.

At step three, the ALJ found that Sarah M.'s impairments didn't meet or medically equal the severity of one of the agency's listed impairments. R. 18–20. First, the ALJ considered listing 11.17, which includes Huntington's disease and other neurogenerative disorders of the central nervous system. R. 18–19; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (To qualify under listing 11.17, a claimant must have either (A) an extreme limitation in the ability to stand up, balance, or use the upper extremities or (B) marked limitations in physical functioning and in one of four areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4)

adapting or managing oneself.); 20 C.F.R. § 404.1520a(c) (explaining how the agency assesses limitations in the four areas of mental functioning).

The ALJ decided that Sarah M. didn't qualify under the first part of listing 11.17 because she didn't have an extreme limitation in her physical functioning. R. 18. As for plaintiff's mental functioning, the ALJ found only a mild limitation in the area of understanding, remembering, and applying information because plaintiff had no record of treatment for memory problems, her mental status was intact during an exam with a neuropsychiatry specialist, another exam found that Sarah M. had no deficit in recall, plaintiff taught a class online, and Sarah M.'s high level of education (she earned a Ph.D.) made it reasonable that she would perceive a deficit due to her conditions. R. 18, 44, 46–51, 506, 521. The ALJ found that Sarah M. had no limitation in her ability to interact with others, citing an opinion by the state agency psychological consultant, plaintiff's teaching, and reports from Sarah M., her husband, and sister showing that she didn't have problems getting along with others. R. 19, 46–51, 85, 311–12, 330–31, 360–61. In the area of concentrating, persisting, or maintaining pace, plaintiff said that her insomnia greatly reduced her abilities. R. 312. But in addition to teaching a class, Sarah M. also said that she read for two to three hours on most days and finished at least one book per month. R. 62. Plaintiff's mental status exams were generally normal, and her thought processes were intact if sometimes slow. *See* R. 470–71, 506, 521, 731. While a state agency consultant found only a mild limitation, R. 85, the ALJ found that Sarah M.'s symptoms and testimony warranted a moderate limitation in her ability to concentrate, persist, or

maintain pace. R. 19. In the fourth and final Paragraph B criteria—adapting and managing oneself—the ALJ found that plaintiff had no limitation. R. 19. While Sarah M. said she experienced symptoms of depression and anxiety daily and that her mental health problems impacted her sleep, the state agency consultants found only a mild limitation, the state's physical examiner concluded that Sarah M. had minimal signs of depression, plaintiff's mental exams were generally normal, she didn't receive treatment or medication for anxiety, and plaintiff drove a car, shopped, and handled finances. R. 55–56, 85, 310–12, 470–71, 506, 521–22, 731. Having found that Sarah M. didn't have a marked limitation in any of the four areas of mental functioning, the ALJ concluded that plaintiff didn't qualify under listing 11.17. R. 18.

Also at step three, the ALJ considered whether Sarah M. met the requirements for listing 12.06, which includes anxiety and obsessive-compulsive disorders. R. 18–20; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listing 12.06 requires a showing of medical documentation of anxiety, panic, or obsessive-compulsive disorders and either (1) an extreme limitation of one or marked limitation of two of the four areas of mental functioning or (2) a documented history of the disorder over a period of at least two years, evidence of medical treatment that is ongoing, and a minimal capacity to adapt to change.). Because Sarah M.'s impairments didn't cause two marked or any extreme limitations in the Paragraph B criteria (as discussed above), and the record didn't show a serious and persistent disorder, the ALJ found that plaintiff's impairments didn't qualify under listing 12.06. R. 19.

Having found that Sarah M.'s conditions didn't meet or medically equal the severity of the agency's listed impairments, the ALJ assessed plaintiff's residual functional capacity to complete steps four and five of the analysis. R. 20–24. A person's RFC represents her capacity to perform physical and mental activity in a work setting—eight hours a day, five days a week—despite her impairments. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC assessment considers all of the evidence (medical and non-medical) and all of a claimant's limitations. 20 C.F.R. § 404.1545(a)(2)–(3).

The ALJ began his RFC analysis by reciting Sarah M.'s symptoms. R. 20–21. Plaintiff said that she had suffered from insomnia for more than eight years, her Huntington's disease caused chronic fatigue, and she was exhausted, weak, and suffered loss of motor control. R. 51–53, 58–60. Plaintiff testified that her hands were weak, but that she did not experience many tremors. R. 57. Regarding her mental health, Sarah M. said that she had short-term memory problems, depression, and was anxious every day. R. 53–56. Plaintiff testified that her anxiety sometimes meant that she didn't sleep. R. 55–56.

Sarah M. said that her problems prevented her from working, but the ALJ found that plaintiff's symptoms weren't as intense, persistent, or limiting as she alleged. R. 21. The ALJ found that plaintiff's symptoms were inconsistent with her mental health records, which showed only mild impairment and no prescription for related medications. R. 470–71, 506, 521, 543, 555, 731. The ALJ also discounted plaintiff's account because she taught a class and was able to drive, shop, and handle

6

household finances. R. 46–51, 310. While plaintiff said that she was fatigued, the ALJ found that Sarah M. hadn't been treated for fatigue and that her reports of exhaustion were inconsistent with plaintiff's abilities to care for herself and to complete other daily activities. R. 21, 308–14.

The ALJ accurately summarized the medical records. R. 20–24. Plaintiff was diagnosed with Huntington's disease in March 2018. R. 455–56. Six weeks later, Sarah M. saw a neurologist about her insomnia. R. 468–69. She made an error on one exercise but plaintiff's mental status examination was otherwise normal, and she was oriented and attentive. R. 471. A physical examination found some mild twitching or borderline chorea,[4] but also normal strength, gait, and coordination. R. 471–72. The neurologist referred plaintiff to a Huntington's specialist, but didn't prescribe any medications except melatonin. R. 472.

Sarah M. saw specialists about her sleep problems. R. 495–507. Results were normal during physical and mental examinations: a sleep specialist did not find any chorea, but noted that Sarah M. had some subtle fidgeting. R. 502. In three follow-up appointments, Sarah M. complained of near-falls, but had no clear complaints about her motor control abilities. R. 526, 554–55, 871–72. The specialist documented her continued sleep problems, minimal chorea, and a mild mood disorder. R. 526–28, 554–

---

[4] A common symptom of Huntington's, chorea is "involuntary jerking or writhing movements." *Huntington's disease*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/huntingtons-disease/symptoms-causes/syc-20356117 (last visited July 25, 2022).

7

55, 872–73.[5] He found that Sarah M. could drive and handle finances, and mental and physical examinations were largely normal. R. 555, 872–73.

During an appointment with a neuropsychiatry specialist, Sarah M. said that she had anxiety and problems with sleep, short-term memory, concentration, and word-finding, but a mental status examination was normal. R. 504–06. The doctor found that Sarah M. should continue outpatient psychiatric care but didn't need medication. R. 507. A follow-up showed no new problems. R. 638–40.

Plaintiff suffered an episode of Bell's palsy in June 2018. R. 706–07. Sarah M. arrived at the emergency room complaining of numbness in her face and neck pain. R. 706. Plaintiff's motor function, strength, reflexes, and gait were normal, however, and she had no difficulty finding words and was neurologically intact. R. 707.

In July 2018, Plaintiff saw another specialist about her insomnia. R. 508–10. Sarah M. said that her sleep had gotten worse over time, and that in the last year she had usually experienced two bad nights of sleep for every good one. R. 508. The specialist wrote that plaintiff's evaluation was consistent with insomnia disorder, possibly related to her Huntington's disease. R. 509. He recommended cognitive behavioral therapy. R. 509.

At an August appointment with the state's consultative internal medicine examiner, Sarah M.'s physical examination was normal, with full range of motion and normal gait. R. 515–16. She said that she could cook, shop, and take care of

---

[5] Similarly, a doctor at a movement disorders clinic reported minimal chorea and a mild mood disorder. R. 873–74.

herself. R. 514. A neurological exam showed slightly reduced strength on Sarah M.'s left side, but plaintiff had normal sensation, speech, and motor control. R. 517. At an appointment with the state's consulting psychological examiner a month later, Sarah M.'s immediate and delayed recall was unimpaired, but she only managed to repeat five digits backwards. R. 521. The examiner concluded that plaintiff had only minimal signs of depression, but worsening physical skills that were interfering with her functioning. R. 522.

The ALJ also considered the medical opinions about Sarah M.'s limitations. R. 20–24. The sleep neurology specialist—Dr. Danny Bega—found that Sarah M.'s fatigue was so severe that she could not complete daily activities like getting groceries and cleaning, that she had a significant mood disorder, shouldn't be working, and could stand or walk for just one hour during a work day. R. 562–65, 821–23. The ALJ didn't credit Dr. Bega's opinion because the physical limitations that Bega endorsed weren't consistent with normal results from Bega's own examinations or those of another doctor, and because Sarah M. said she only rarely took naps. R. 23–24, 474–75, 502, 508, 526–28, 872–73. The ALJ discounted Bega's conclusion that plaintiff had a significant mood disorder because examinations by Bega, another doctor, and the state's psychological consultants showed minimal psychological problems. R. 23–24, 502, 504, 520–23, 526–28, 872–73.

The state consultants found that plaintiff could perform light work with some limitations, and that Sarah M. had no more than mild limitations in her mental functioning. R. 85–89, 98–103. The ALJ found these opinions somewhat persuasive,

9

but concluded that plaintiff had slightly greater limits based on her symptoms, testimony, waxing and waning fatigue, and the effects of plaintiff's problems on her concentration, persistence, and pace. R. 24.

Based on this evidence, the ALJ found that Sarah M. had the RFC to perform sedentary work, but had to avoid even moderate exposure to hazards such as dangerous machinery and heights, could not be required to work at a fast-paced production rate, and could not be held to strict quotas for her work product. R. 20. At step four, the ALJ concluded that plaintiff couldn't return to her past work as a faculty member at a major university. R. 24. In the final step of the analysis, the ALJ found that Sarah M. could make a successful transition to other work, citing a vocational expert's testimony. R. 24–25. The vocational expert testified that someone of plaintiff's age, education, experience, and abilities could find work as an information clerk, inspector, or assembler. R. 70–75. The ALJ found that Sarah M. was not disabled. R. 25–26.

Plaintiff sought review of the ALJ's decision, but the Social Security Appeals Council denied her request. R. 1–3. The ALJ's decision became final when the Council denied plaintiff's request for review. R. 1. Sarah M. filed this suit, seeking judicial review of the agency's decision. [1].

**III. Analysis**

An ALJ must apply the right legal criteria, support his decision with substantial evidence, and build an accurate and logical bridge to a conclusion. *See Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020); *Gedatus v. Saul*, 994 F.3d 893, 900

(7th Cir. 2021). The ALJ doesn't need to address the entire record to build the required bridge, but must engage with the evidence such that the court can follow his reasoning. *See Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (citations omitted); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Harmless error review applies to the ALJ's decision. *Alvarado v. Colvin*, 836 F.3d 744, 751 (7th Cir. 2016) (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)).

At issue here are the ALJ's step-three and RFC analyses. *See* [11] at 6–15. Plaintiff argues that the ALJ's step-three findings were flawed because he never expressly acknowledged that Huntington's disease is on the agency's list of compassionate allowances—conditions that qualify for expedited processing. *Id.* at 7–8; *see* 20 C.F.R. § 404.1602. Plaintiff also argues that the ALJ failed to consider whether her impairments were medically equivalent to listing 11.17. [11] at 8–11. Sarah M. objects to the ALJ's RFC based on how the ALJ discredited plaintiff's symptoms and Dr. Bega's opinion, and because the RFC failed to account for her inability to concentrate, persist, and maintain pace. *Id.* at 11–15.

### A. Step Three: Compassionate Allowance and Medical Equivalence

The agency has developed an expedited process called compassionate allowance, which applies to claims that "involve impairments that invariably qualify [under the agency's listings] based on minimal, but sufficient, objective medical evidence." 20 C.F.R. § 404.1602. Compassionate allowance cases can be identified either initially by the agency's software or at later stages of review. POMS DI 23022.010(B)(1). When a claimant alleges a condition that is on the compassionate

11

allowances list, the agency's software should automatically designate the case for expedited processing. *Id.*

Adult-onset Huntington's disease is one of the compassionate allowance conditions. POMS DI 23022.923. Sarah M. listed Huntington's among her conditions in her application for disability benefits and plaintiff's counsel raised the issue at the hearing and again in a letter to the Appeals Council. R. 78, 291, 421. The ALJ cited the relevant agency guidance, *see* R. 21 (citing POMS DI 23022.923), but plaintiff's case doesn't appear to have been handled using the expedited process. *See* POMS DI 23022.010(C)(1) (Compassionate allowance cases are assigned to designated disability examiners and processed as expedited cases.).

The ALJ didn't exercise his discretion to treat Sarah M.'s claim through the compassionate allowance approach, but plaintiff hasn't shown prejudice from this omission, or that expedited processing would have changed the outcome. Even under the compassionate allowance method, the ALJ retained discretion to evaluate plaintiff's claim using the standard step-three analysis. *See* POMS DI 23022.923 ("Adjudicators may, at their discretion, use the Medical Evidence of Record or the listings suggested to evaluate the claim."). In this case, the ALJ considered listing 11.17 under an ordinary analysis, *see* R. 18–20, and plaintiff hasn't shown how applying the compassionate allowance framework would have made any difference. *See Robinson v. Colvin*, CASE NO. 15-60502-CIV-HUNT, 2016 WL 4801346, at *2–3 (S.D. Fla. Jan. 5, 2016) (citing *Hall v. Colvin*, No. 1:12-CV-00347-REB, 2013 WL 4776463, at *4 (D. Idaho Sept. 4, 2013)) (ALJ's failure to consider compassionate

12

allowance framework was harmless error.); *Bowers v. Saul*, Civil Action No. 19-17386, 2020 WL 4435405, at *10–12 (D.N.J. Aug. 3, 2020) (same, collecting cases). Any related error (as discussed below) is harmless.

Sarah M. argues that the ALJ didn't consider whether her impairments were medically equivalent to a disabling impairment. [11] at 8–11. An impairment is presumptively disabling at step three if it meets the requirements of or is medically equivalent to a listing. *See* 20 C.F.R. §§ 404.1525(a), 404.1526(a); *Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir. 2020). To demonstrate medical equivalence, a claimant must show "other findings related to your impairment that are at least of equal medical significance to the required criteria." 20 C.F.R. § 404.1526(b)(1)(ii). The ALJ must discuss the relevant listing by name and offer more than perfunctory analysis. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).

The ALJ found that Sarah M.'s impairments didn't medically equal the severity of listing 11.17. R. 18. The support for that conclusion is found both in the ALJ's step-three analysis and in his more thorough RFC discussion. *See* R. 18–24; SSR 17-2p, 2017 WL 3928306, at *4 (Mar. 27, 2017) ("An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3."); *Jeske v. Saul*, 955 F.3d 583, 589 (7th Cir. 2020) (citing 20 C.F.R. § 404.1520(a)(4)) (The five-step process can involve overlapping reasoning.).

13

The ALJ identified two listings—11.17 and 12.06—relevant to Sarah M.'s case, and discussed the requirements for each. R. 18–20. The discussion of the evidence at step three centered on plaintiff's mental health. R. 18–20. The ALJ summarized Sarah M.'s alleged symptoms relevant to the four paragraph B criteria—her statements that her concentration, memory, and understanding were compromised due to lack of sleep, that fatigue kept her from leaving her couch, and that she experienced depression and anxiety symptoms daily. R. 18–19, 51, 55–56, 312. The ALJ discussed a series of normal psychological examinations and memory test results, the opinions of the state's psychological consultants, and a lack of treatment or medication for memory problems, anxiety, or depression. R. 18–19, 55, 85, 470–71, 506, 521–22, 731. The ALJ also noted function reports completed by Sarah M. and others showing that plaintiff wasn't limited in her interactions with others, and plaintiff's daily activities: reading for two to three hours a day, teaching a course online, driving, shopping, and handling household finances. R. 19, 46–51, 62, 310–12, 330–31, 360–61.

The ALJ's discussion of the evidence continued in the portion of the opinion analyzing Sarah M.'s RFC. *See* R. 20–24; *Jeske*, 955 F.3d at 589–90. The ALJ discussed Sarah M.'s symptoms in more detail, acknowledging her reported history of insomnia, chronic fatigue, weakness, instability, loss of motor control, depression and anxiety. R. 20–21, 51–60. As discussed below at 16–17, the ALJ found plaintiff's account to be inconsistent with her ability to teach, drive, shop, and handle household

14

finances, normal physical and psychological examinations, and an absence of treatment for fatigue. R. 21, 46–51, 308–14, 471–72, 506, 521–22, 543–44, 555, 731.

The ALJ noted Sarah M.'s positive test for Huntington's disease, R. 455–56, and took account of exams—showing almost exclusively normal results—conducted by plaintiff's neurologists, a sleep specialist, and the state's consulting examiners. R. 471–72, 502, 504–06, 515–17, 521–22, 555, 638–40. Reports from Dr. Bega showed strict limitations related to Sarah M.'s fatigue, R. 562–65, 821–23, but (as discussed below at 17–18) the ALJ chose not to credit that opinion based on Bega's own normal examinations and those of other doctors, plaintiff's report that she didn't take naps frequently, and plaintiff's daily activities. R. 23–24. Opinions by the state agency consultants—finding that Sarah M. could perform light work with some mild limitations related to her mental functioning—weren't entirely persuasive, either, because the ALJ chose to credit plaintiff's symptoms and testimony about fatigue, and the way it affected her concentration, persistence, and pace. R. 24, 85–89, 98–103. The state's consultants and a third doctor found that plaintiff's impairments weren't equal to or medically equivalent to listing 11.17. R. 85–89, 98–103, 544.

Based on this record, the ALJ found that Sarah M. had a mild limitation in understanding, remembering, or applying information, a moderate limitation in the area of concentrating, persisting, or maintaining pace, no extreme physical limitation, and that her conditions didn't meet or medically equal a listing. R. 18–19. Plaintiff argues that substantial evidence supported a marked limitation in physical functioning and an extreme limitation in concentration, persistence, or maintaining

15

pace, [11] at 8–10, but that's not how the test works. *See Mandrell v. Kijakazi*, 25 F.4th 514, 515 (7th Cir. 2022). The ALJ discussed the relevant evidence, including those parts favorable to claimant. R. 18–24. The district court cannot reweigh the evidence now. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). That there's some evidence that plaintiff's condition was worsening, and that Huntington's disease is a compassionate allowance condition, is not a sign of error in the ALJ's reasoning. The disability inquiry focuses on plaintiff's condition during the period of disability, and doesn't consider whether a claimant will later become disabled because of worsening impairments. *See* 20 C.F.R. § 404.1505(a) (A person is disabled when they are unable to work because of any impairment); SSR 18-01p, 2018 WL 4945639, at *2 (Oct. 2, 2018) (A claimant's onset date is "the earliest date that the claimant meets both the definition of disability and the non-medical requirements for entitlement."). The ALJ's discussion of the record evidence—located at step three and in his analysis of plaintiff's RFC—adequately explained why Sarah M.'s impairments didn't meet or medically equal listing 11.17.

### B. RFC

At the RFC stage, the ALJ discounted plaintiff's reports of her symptoms for three reasons: (1) she hadn't been treated for fatigue; (2) exams were largely normal and plaintiff hadn't been prescribed medication for her conditions; and (3) she could shop, drive, handle finances, and teach. R. 21.

The first of these reasons is wrong: the record shows that plaintiff repeatedly sought and received treatment for Huntington's disease, insomnia, and for the fatigue she felt as a result of those conditions. *See, e.g.*, R. 498, 872–74. But the ALJ had two other, good reasons to discount Sarah M.'s account. First, the ALJ relied on a series of normal examinations showing only mild symptoms associated with Huntington's, anxiety, and depression and the fact that plaintiff wasn't prescribed medication to treat her problems. *See* R. 21, 470–72, 506, 521–22, 543–44, 555, 731. Second, the ALJ reasonably found that plaintiff's abilities to teach, shop, drive, and handle household finances were inconsistent with Sarah M.'s report of her symptoms. *See* R. 21, 46–51, 308–14.[6]

The ALJ's treatment of Dr. Bega's opinion was also appropriate. *See* R. 23–24. Bega found that Sarah M. had a significant mood disorder and that her fatigue was severely limiting. R. 562–65, 821–23. The ALJ chose not to credit that opinion in light of (1) Bega's own examinations—which were largely normal, showing only minor physical and mental restrictions; (2) the examinations of two other doctors and the psychological consultants, showing similarly minor limits; and (3) plaintiff's statement that she rarely took naps. R. 23–24, 474–75, 502–03, 520–22, 526–528, 872–73. The ALJ adequately articulated his reasons for rejecting Dr. Bega's opinions.

---

[6] Plaintiff argues that her ability to complete these daily activities doesn't mean that she could work on a full-time basis, [11] at 12, but the ALJ didn't equate plaintiff's activities with the work of a full-time job. *See* R. 21. Instead, following agency guidance, he considered what plaintiff said she was able to do and found that those statements cast doubt on the severity and limiting effects of her symptoms. *See Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020) (citing *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) and 20 C.F.R. § 404.1529(a), (c)(3)). *Cf. Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (ALJ failed to recognize difference between activities of daily living and those in a full-time job).

*See* 20 C.F.R. § 1520c(c) (supportability and consistency are factors the agency considers in weighing medical evidence).

Plaintiff argues that—having rejected Dr. Bega's opinion—the ALJ played doctor in determining her RFC, [11] at 13, but that's not what happened. An ALJ isn't required to rely entirely on any physician's opinion or to choose between the opinions in the record. *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (citing *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995)). The ALJ in this case gave partial weight to the opinions of the state agency consultants, but disagreed with them (in plaintiff's favor) about Sarah M.'s abilities. R. 24. The RFC wasn't pulled from the ALJ's head, but was instead grounded (as discussed above at 14–15) in the opinions of the state consultants, plaintiff's testimony, and a long string of largely normal physical and psychological examination results. *See* R. 20–24.

The RFC adequately accounted for Sarah M.'s limitations in her ability to concentrate, persist, or maintain pace. The record showed largely normal medical evaluations, that plaintiff could read for hours each day, drive, shop, and handle household finances, but also had problems with sleep and fatigue. The ALJ reasonably understood the evidence to mean that plaintiff's problems came and went. R. 21, 24. He gave some credit to Sarah M.'s account of her fatigue and imposed related limits: claimant could not work in a situation that called for fast-paced production, and couldn't be held to a strict work quota. *See* R. 20, 24. By imposing these requirements, the ALJ tailored the RFC: he found that plaintiff had the abilities required for sedentary work, but might be slower than other workers and need to

18

work at her own pace.[7] The ALJ didn't rely on catch-all terms, and instead explicitly tied the limits on fast-paced production work and quotas to plaintiff's fatigue and its effects on her concentration, persistence, and pace. R 24.

Plaintiff was entitled to an expedited processing of her claim and the ALJ discounted her symptom evidence based on a misreading of the record about her treatment for fatigue. But because the ALJ's analysis at step three was appropriate even under the compassionate allowance approach and he had two other reasons to discount plaintiff's symptoms (normal medical evaluations and plaintiff's activities), it's clear how the ALJ would resolve this case again on remand, and these errors are harmless. *See Alvarado v. Colvin*, 836 F.3d 744, 751 (7th Cir. 2016) (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)). Substantial evidence supports the decision, and the ALJ built the required bridge to his conclusion.

## IV. Conclusion

Plaintiff faces a difficult, likely disabling prognosis. But the record before the ALJ substantially supported a conclusion that she was not yet disabled. Plaintiff's motion for summary judgment, [11], is denied. The Commissioner's motion, [16], is granted. The ALJ's decision is affirmed. Enter judgment and terminate case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: August 5, 2022

---

[7] As in the case plaintiff relies on, the ALJ went beyond restricting Sarah M. to work of a certain level of difficulty, and appropriately tailored the RFC to her limitations. *Cf. Martin v. Saul*, 950 F.3d 369, 373–74 (7th Cir. 2020) (citation omitted).